UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nicole Thompson and
Bradford Thompson,

Civil No. 08-4939 (DWF/AJB)

Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

Anoka-Hennepin East Metro Narcotics
and Violent Crimes Task Force
and Officers John and Jane Does 9-18,

Defendants.

_____

Bryan R. Battina, Esq., and Michael H. Frasier, Esq., Bock & Battina, LLP, counsel for Plaintiffs.

Jason M. Hiveley, Esq., Jon K. Iverson, Esq., and Andrea B. Wing, Esq., Iverson Reuvers, LLC, counsel for Defendants.

_____

**INTRODUCTION**

This matter is before the Court on a Motion for Summary Judgment brought by Defendants Anoka-Hennepin East Metro Narcotics and Violent Crimes Task Force (the "AHTF") and Officers John and Jane Does 9-18 (the "individual officers") (collectively, "Defendants"). In their Amended Complaint, Plaintiffs assert violations of 42 U.S.C. § 1983 for excessive force, false arrest, false imprisonment, and failure to train, as well as state-law claims for assault, battery, false arrest, false imprisonment, and respondeat

superior.¹ For the reasons stated below, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

This lawsuit arises from a drug investigation and raid initiated and conducted by Defendants, during which Defendants were randomly and mistakenly led to Plaintiffs' home. On February 15, 2007, Officer John Doe No. 13 ("Officer No. 13") was asked by an unidentified investigator for the Anoka County Sheriff's Office to speak with a confidential informant ("CI"). (Aff. of Officer No. 13 ("Officer No. 13 Aff.") ¶ 3.) The CI claimed to have information about a potential drug deal. (*Id*.) The investigator explained that the CI had worked for him before and was reliable. (*Id*.) Officer No. 13 then spoke with the CI. The CI claimed that he was a former high volume hydroponic marijuana dealer and that he had been an informant in the past. (*Id*.) The CI told Officer No. 13 that his friend, Ryan Baker, told him about an opportunity to purchase up to 22 pounds of hydroponic marijuana at $2,800 a pound. The CI stated that Baker told him that he met the alleged drug dealer in jail and Baker identified the dealer as a "Mexican friend." (Aff. of Jason Hiveley ("Hiveley Aff." ¶ 5, Ex. D (Dep. of the CI ("CI Dep.")) at 22-25.) The CI also testified at his deposition that he believed he gave those details to Officer No. 13. (*Id*.) Officer No. 13 discussed the information he obtained from the CI

---

¹ At the hearing on this matter, Plaintiffs abandoned their *Monell* claim against the AHTF for failure to train. Accordingly, Count Nine of the Amended Complaint is dismissed. Plaintiffs maintain, however, that the AHTF is liable for state-law claims
(Footnote Continued on Next Page)

2

with AHTF team leaders and they decided to have the CI set up a controlled buy. (Officer No. 13 Aff. ¶ 3.)

The CI informed Baker that he was interested in purchasing a "couple of pounds" of marijuana. (CI Dep. at 25.) On February 16, 2007, the CI confirmed with Officer No. 13 that the plans for the controlled buy were in place. (Officer No. 13 Aff. ¶ 4.) Even though the CI requested information about the location of the alleged drug house, Baker would not disclose that information. (*Id.*; CI Dep. at 28.) On the morning that the controlled buy was to take place, Officer No. 13 met the CI in a parking lot and gave the CI an audio transmitter and $2,800 for the buy. (Officer No. 13 Aff. ¶ 5; CI Dep. 26-27.) The CI and his car were searched. (*Id.*) The CI then drove to Baker's home with police officers trailing him. As he neared Baker's home, Baker called the CI and informed him that the buy was to take place in Spring Lake Park. (Officer No. 13 Aff. ¶ 5.) The CI repeated this information so that the officers would hear through the audio transmitter.

The CI then picked up Baker. (CI Dep. at 25.) Defendants listened to the audio transmission of the conversation between the CI and Baker. (Officer No. 13 Aff. ¶ 6.) The CI "could tell that [Baker] was stoned out of his mind on meth." (CI Dep. at 25.) The CI expressed his concern to Baker about Baker being "very, very high." (*Id*. at 29.) During the ride, Baker also repeatedly asked for the money, but the CI told him he would give Baker the money after he saw the drugs. (*Id*. at 29-30.) Baker gave the CI directions

---

(Footnote Continued From Previous Page)
brought against the individual officers through the doctrine of respondeat superior.

to the alleged drug house. During the drive, Baker told the CI that the drug dealers "do not mess around." (Officer No. 13 Aff. ¶ 6.) Baker told the CI to pull into the driveway of Plaintiffs' house. Defendants understood that the CI and Baker would be meeting a Hispanic male. Meanwhile, the individual officers positioned themselves around the neighborhood within a few blocks of Plaintiffs' house. (Officer No. 13 Aff. ¶ 7.)

Both the CI and Baker exited the vehicle and approached Plaintiffs' front door. (CI Dep. at 34-35.) As Baker and the CI were walking to the door, Baker repeatedly demanded the money. (CI Dep. at 31.) At 1:06 p.m., the CI or Baker rang the doorbell and the CI handed Baker the money. (Officer No. 13 Aff. ¶ 6; Hiveley Aff. ¶ 6, Ex. E (Dep. of Ryan Baker ("Baker Dep.")) at 10-11; CI Dep. at 35-36, 54.) Baker tried to run away, but the CI stopped him. (CI Dep. at 36.) Plaintiff Nicole Thompson opened the door and saw the two men arguing on her front porch. (Hiveley Aff. ¶ 3, Ex. B. (Dep. of Nicole Thompson ("N. Thompson Dep.")) at 32-33.) Nicole Thompson called to her husband for help and went back into the house. (*Id*. at 36.) Plaintiff Bradford Thompson came outside and separated the CI and Baker. (Hiveley Aff. ¶ 2, Ex. A (Dep. of Bradford Thompson ("B. Thompson Dep.")) at 66-70.)[2] The CI and Baker began to tell Bradford Thompson their respective sides of the story, at which time Bradford Thompson realized that one of the guys thought his house was a drug house. (*Id*. at 69.) At this point,

---

[2] During this encounter, Bradford Thompson shoved both the CI and Baker against a wall. (B. Thompson Dep. at 68-69.)

4

Bradford Thompson told Nicole Thompson to call 911 and she did so. (*Id*. at 70-72.) At some point, the Plaintiffs' friend Wade Cordts, who was also inside the house, joined Bradford Thompson on the front porch. Cordts grabbed and held Baker by the throat and the hand and held him against the wall. (Hiveley Aff. ¶ 4, Ex. C. (Dep. of Wade Cordts ("Cordts Dep.")) at 31.) Bradford Thompson and Cordts told the CI and Baker that they were going to wait for the police and let the police sort things out. (*Id*.; B. Thompson Dep. at 70-72.)

Officers heard the struggle over the audio transmitter and Officer No. 13 gave the distress call "Bust, Bust, Bust" over the radio, indicating that the officers should move in because the CI was being robbed. (Officer No. 13 Aff. ¶ 7.) Shortly thereafter, officers approached the house with guns drawn. The parties dispute whether the officers initially announced that they were the police or displayed their badges.[3] Several of the officers were out of uniform. Officer John Doe No. 11 ("Officer No. 11"), who appeared to Bradford Thompson to be a biker, was the first to arrive on the scene. He commanded Bradford Thompson to the ground at gunpoint and Bradford Thompson complied. (B. Thompson Dep. at 74-76.) Bradford contends that Officer No. 11 pointed a gun at his

---

[3] The transcript indicates that the individual officers first on the scene identified themselves as police. Plaintiffs assert that the recording has been altered. (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 10.) The Court need not decide whether the recording has been altered at this time because the Court's ultimate determination on the present motion does not rest on the factual issue of whether the police properly identified themselves.

5

head and ordered him to "freeze" or he would "shoot [him] in the fucking head." (B. Thompson Dep. at 75-76.)

Officer John Doe No. 18 ("Officer No. 18") arrived next and secured Bradford Thompson, Cordts, Baker, and the CI while other officers entered the home. (Aff. of Paul Sommer ("Sommer Aff.")) ¶ 3, Exs. B, E, F.) He said "anybody fucking moves they get a boot to the head, you understand." (*Id*.) Inside, the officers encountered Nicole Thompson and ordered her to the ground. Nicole Thompson contends that the officer who confronted her was in plain clothes, pointed a gun in her face, ordered her to the ground, and told her that if she moved, he would "shoot [her] in the fucking head." (N. Thompson Dep. at 42-43.) Nicole Thompson asserts that she thought she was being robbed. When ordered to get up, Nicole Thompson claims she was too afraid to stand. At that point, Nicole Thompson contends that the officers picked her up by her right arm, injuring it, took her to the basement, handcuffed her with a gun pointed at her head, and brought her back upstairs. (*Id*. at 46-47, 52.) Nicole Thompson asked to use the restroom, but was denied multiple times. (*Id*. at 54-57.) When the officers patted her down and required her to spread her legs, she urinated on herself. (*Id*.)

Meanwhile, Bradford Thompson began to move up off of his chest and told the officer near him that he had had open heart surgery and could not lie on his chest. (B. Thompson Dep. at 84.) Bradford continued to move up and the officer put a knee in his back, pulled his arms back, and handcuffed him. (*Id*.) Bradford Thompson repeated that he could not be on his chest. (*Id*. 85.) The officer moved off of Bradford Thompson's

back and "yanked" him up to his knees, at which point Bradford Thompson "heard it tear inside." (*Id*.) Bradford Thompson contends that he complained that his chest hurt and asked that his handcuffs be placed in front and that the officer ignored this request. (*Id*.)

Plaintiffs and Cordt were brought to the kitchen area of the house. When the officers realized that the Plaintiffs were not drug dealers, they and Cordt were uncuffed. Baker was charged and pled guilty to felony theft by swindle.

Bradford Thompson asserts that as a result of the police officer's actions, he ruptured and herniated discs in his back, suffered interior surgical tearing in his chest, and developed a hernia. (B. Thompson Dep. at 93, 95-96; Aff. of Michael H. Frasier ("Frasier Aff.") ¶ 8, Ex. G.) Nicole Thompson asserts that she suffered severe bruising on her upper right forearm. (N. Thompson Dep. at 46.) Both Thompsons assert that they suffer anxiety, fear, loss of self-esteem, paranoia, night terrors, and panic attacks.

## MEMORANDUM

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Qualified Immunity and Federal Claims

The individual officers contend that they are protected by qualified immunity against Plaintiffs' federal claims. Qualified immunity shields government officials as well as private individuals from civil liability under 42 U.S.C. § 1983. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). A defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To survive a motion for summary judgment on qualified immunity grounds, the plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of material fact as to

8

whether a reasonable official would have known that the alleged action violated the plaintiff's clearly established rights. *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999) (citing *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)).[4] "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### A. Unlawful Arrest and Unreasonable Search under 42 U.S.C. § 1983

Plaintiffs assert that the individual officers unreasonably entered their house and that they were unlawfully arrested and imprisoned in violation of their Fourth Amendment right to be free from "unreasonable searches and seizures."[5] U.S. Const. amend. IV. There is no dispute that the individual officers entered Plaintiffs' house and handcuffed and restrained Plaintiffs without a warrant. A warrantless search of an individual's house violates the Fourth Amendment unless it is supported by probable cause and exigent circumstances. *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996) ("Police officers may not enter or search a home without a warrant unless justified by

---

[4] In *Saucier v. Katz*, the Supreme Court mandated a two-step sequential test for resolving qualified immunity claims—the establishment of a violation of a constitutional right and that the right in question is "clearly established" at the time of the alleged violation. 533 U.S. 194, 200 (2001). Courts now have discretion to decide which of these prongs to address first. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

[5] In their Amended Complaint, Plaintiffs also allege violations of their Fifth and Fourteenth Amendment Rights. However, Plaintiffs have since limited their arguments to the Fourth Amendment.

9

exigent circumstances."); *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987). In addition, absent exigent circumstances, an arrest warrant is required to arrest a suspect in his or her home. *Haley v. Armontrout*, 924 F.2d 735, 737 (8th Cir. 1991); *United States v. Clement*, 854 F.2d 1116, 1118-19 (8th Cir. 1988).

Probable cause exists if the totality of facts, based on reasonably trustworthy information, would justify a prudent person in believing the individual arrested had committed an offense at the time of the arrest. *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000) (citing *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986)). Officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause, so long as the mistake is objectively reasonable. *Id*. (explaining that the issue for immunity purposes is whether there is arguable probable cause). Exigent circumstances might justify a warrantless entry into a home when lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed. *Ball*, 90 F.3d at 263; *Clement*, 854 F.2d at 1118-19. The exigent circumstances exception to the warrant requirement is narrowly drawn. *Clement*, 854 F.2d at 1119.

Plaintiffs assert that the individual officers did not have probable cause to enter Plaintiffs' home or to seize them because the officers lacked reasonably trustworthy information to believe a crime had been committed. Instead, Plaintiffs argue that the individual officers unreasonably relied only on the information coming from Baker, a known drug dealer who was intoxicated when he identified Plaintiffs' home as a "drug

10

house." Plaintiffs maintain that other circumstantial evidence undercuts the reasonableness of individual officers' reliance on Baker, such as the fact that Nicole Bradford called 911 and that Plaintiffs did not meet the physical description of the alleged drug dealer. Further, Plaintiffs assert that there were no exigent circumstances that would justify the warrantless entry into the house because there was no flight risk and it was unreasonable to fear that 22 pounds of marijuana could be destroyed before obtaining a warrant.

The individual officers, on the other hand, assert that arguable probable cause existed to detain all persons inside the Plaintiffs' home because the officers believed they were at a drug house, heard a scuffle ensuing over the audio transmitter, understood that the CI was being robbed, and arrived at the scene to discover two unknown men from inside the alleged drug house physically restraining the CI and Baker. The individual officers contend that based on rapidly escalating events, they reasonably concluded that the people inside the home were involved in illegal activity. The individual officers further assert that they were entitled to conduct a "protective sweep" of the premises because they had a reasonable belief that the area could harbor an individual who posed danger to the officers or others and that exigent circumstances justified the warrantless entry.

The record reveals that the individual officers were led randomly to the Plaintiffs' house. The deficient investigation performed by the individual officers demonstrates that the information upon which they relied was not reasonable. For example, there is no

record evidence that the individual officers conducted any sort of background investigation into the address to which Baker led the CI or into the background of the owners of the property. Second, the individual officers relied solely on the information that came from the CI and his friend Baker. They did not seek any evidence to corroborate Baker's statements regarding the existence of the 22 pounds of marijuana prior to setting up or initiating the controlled buy. Yet, less than twenty-four hours after the CI was introduced to Officer No. 13, the officers decided to set up a controlled buy, relying entirely on information supplied by Baker.

The record also reveals many clues that should have suggested that the individual officers were being led to the wrong house and that Plaintiffs were not involved in the purported drug deal. First, Plaintiffs have submitted evidence that could show that the police knew that Baker was high at the time he met with the CI to make the drug buy and that Baker actually intended to steal money from the CI. In particular, there is record evidence that the CI, while wired with the audio transmitter, expressed his concern that Baker was "very, very high." In addition, Baker repeatedly requested that the CI give him the money without first showing the CI the drugs. These repeated requests suggest that Baker never intended to purchase drugs, but instead was planning to steal the CI's money. In addition, after Nicole Thompson opened the front door, the CI told her he was being robbed and asked her to call 911. Again, the CI was wired at the time and there is a fact issue as to whether the individual officers heard this exchange or heard Nicole Thompson actually call 911. Further, Bradford Thompson and Cordts told the CI and

12

Baker that they were going to wait for the police to sort things out. Again, there is a fact issue as to whether the individual officers heard this over the wire. Finally, none of the people that came out of Plaintiffs' house matched the description of the alleged drug dealer. All of the above circumstances undermine the reasonableness of any belief on the part of the individual officers that the Plaintiffs had committed an offense.

Further, a reasonable juror could conclude that no exigent circumstances existed to justify the entry and seizure. First, based on the circumstances described above, a reasonable juror could conclude that the individual officers were not reasonable in their belief that the Plaintiffs committed any offense.[6] Second, the drug raid occurred in the middle of the day and there were nine officers in multiple patrol cars stationed within blocks of the house. This could suggest to a fact-finder that the fear that any suspect may flee was overstated and unreasonable. Third, the individual officers claim that they feared imminent destruction of the drugs that were purportedly in the house. However, the individual officers believed that there were 22 pounds of marijuana in the house. The high volume of drugs suggests that any fear that the drugs would be destroyed before a warrant could be obtained was also unreasonable. Finally, the individual officers claim that they feared for their safety. This fear, however, is undermined again by the fact that it was Nicole Thompson who called 911 and that Bradford Thompson and Cordts were

---

[6]  In addition to the alleged drug deal, the individual officers assert that when they arrived at Plaintiffs' house, they suspected that Plaintiffs were robbing the CI. For the
(Footnote Continued on Next Page)

13

standing outside and explained to the CI and Baker that they were going to wait for the police to sort things out.

In sum, Plaintiffs have pointed to record evidence that seriously undermines the reasonableness of the individual officers' decision to enter the house and to seize the Plaintiffs. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that the individual officers lacked probable cause to enter the Plaintiffs' residence and that no exigent circumstances existed. Further, a reasonable juror could conclude, on the record before it, that no reasonable officer could have believed that probable cause or exigent circumstances existed to justify the entrance into Plaintiffs' house and Plaintiffs' seizure. Accordingly, Plaintiffs have submitted sufficient evidence to overcome the individual officers' assertions of qualified immunity and thus to survive summary judgment with respect to Plaintiffs' claim for unlawful arrest, unlawful entry, and false imprisonment.

### B. Excessive Force under 42 U.S.C. § 1983

Plaintiffs also assert excessive force claims against the individual officers. Specifically, Plaintiffs assert that that the individual officers used unreasonable force when they seized Plaintiffs. Defendants, on the other hand, assert that they are entitled to qualified immunity on Plaintiffs' claims of excessive force because any force used by the

---

(Footnote Continued From Previous Page)
reasons described above, however, a reasonable juror could conclude that any belief that Plaintiffs were engaged in a robbery was also unreasonable.

14

officers was objectively reasonable. Defendants also assert that Nicole Thompson did not suffer any actual injury.

The right to be free from excessive force is clearly established under the Fourth Amendment's prohibition of unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). The Court evaluates excessive force claims under an objective-reasonableness test. *Id*. at 397. In determining whether the use of force is "reasonable" under the Fourth Amendment, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interests at stake. *Id*. at 396 (citation omitted). The reasonableness of the use of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See id*. The reasonableness determination also must make allowances for the fact that police officers make split-second judgments in oftentimes tense situations. *Id*. at 396-97. Therefore, the United States Supreme Court has set out the reasonableness inquiry as one that requires courts to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citing *Scott v. United States,* 436 U.S. 128, 137-39 (1978)). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*. at 396 (citations omitted).

Courts also consider the result of the force in analyzing a claim for excessive force. *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003). Assuming without deciding that a plaintiff must demonstrate some minimum level of injury, the Eighth Circuit has ruled that the necessary level of injury required for a Fourth Amendment excessive force claim is "actual injury." *Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999); *Dawkins v. Graham*, 50 F.3d 532, 535 (8th Cir. 1995). The Eighth Circuit has held that the following examples constitute "actual injury": (1) "bruises and a facial laceration"; (2) "bruised knees and elevated blood pressure"; (3) "posttraumatic stress disorder"; or (4) a "single small cut of the lateral right eyelid and small scrapes of the right posterior knee and upper calf." *Lambert*, 187 F.3d at 936 (citations omitted). However, the Eighth Circuit has ruled that "a de minimus . . . injury is insufficient to support a finding of a constitutional violation." *Crumley*, 324 F.3d at 1007. Thus, not every push or shove violates the Fourth Amendment. *Id*.

As explained above, the record reveals many clues that should have led the individual officers to conclude that Plaintiffs were not involved in criminal activity and their home was not a drug house. The Court incorporates the circumstances outlined in the discussion on Plaintiffs' unlawful entry and seizure claims here. Further, Plaintiffs assert that the record demonstrates that when the police arrived, Bradford Thompson and Cordts had the CI and Baker contained on the front porch, that the situation was under control, and that Plaintiffs were cooperative.

Again, the individual officers assert that when they arrived, they knew the CI was being robbed and believed that he was being robbed by the men inside the home. In addition, the individual officers assert that they believed that Plaintiffs were drug dealers and posed a threat. However, as discussed above, a reasonable juror could conclude that any belief that Plaintiffs were engaged in drug activity or robbing the CI was unreasonable. Thus, a reasonable juror could also conclude that any amount of force used on Plaintiffs was unreasonable. Nonetheless, Plaintiffs submit evidence that the individual defendants forcefully entered Plaintiffs' home, used threats of deadly force and bodily injury, handcuffed Plaintiffs at gunpoint, injured Bradford Thompson by placing a knee in his back and pulling him upright after being told of Bradford Thompson's heart surgery, and injured Nicole Thompson by pulling her up by her right arm. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that the amount of force used was unreasonable and that excessive force was used by the officers in their treatment of Plaintiffs

The evidence before the Court also demonstrates that Bradford Thompson suffered a herniated disc, a ruptured disc, a hernia, and internal tearing. Nicole Bradford's injuries are less severe, but evidence of severe bruising on her arm and that she has received treatment for anxiety is sufficient to support her excessive force claim. The Court

17

determines that Plaintiffs have presented sufficient evidence to overcome Defendants' assertions of qualified immunity and thus to survive summary judgment.[7]

### III. Official Immunity and State-Law Claims

Under Minnesota law, public officials are automatically entitled to official immunity from state law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong. *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990); *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988). Malice, in the official immunity context, means intentionally committing an act that the official has reason to believe is legally prohibited. *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571-72 (Minn. 1994). This is an objective inquiry that examines the legal reasonableness of an official's actions. *Id*.

#### A. Assault and Battery

Plaintiffs assert state law causes of action for assault and battery. Defendants contend that they are entitled to official immunity on the assault and battery claims. An assault is an unlawful threat to do bodily harm to another with the present ability to carry out the threat. *Johnson*, 453 N.W. 2d at 41. Battery is "an intentional, unpermitted

---

[7] Defendants assert that Plaintiff lacks evidence linking a specific officer to the use of excessive force, thus dooming their excessive force claims. The Court disagrees. Plaintiffs have identified every officer at the scene and have identified or narrowed down the officers who surrounded Bradford Thompson, used threats of deadly force, and used force. There is no possibility, and Defendants do not contend, that an individual not named as a defendant caused harm. It will be up to the jury to determine which officers, if any, are liable for the use of excessive force.

offensive contact with another." *Id*. at 40. As discussed above with respect to Plaintiffs' § 1983 claim for excessive force, there is sufficient record evidence to allow a reasonable juror to conclude both that the detention and seizure of Plaintiffs in their home occurred without legal justification and that the force used to detain Plaintiffs was excessive. For the reasons that the Court denied summary judgment on Plaintiffs' claims for excessive force under § 1983, the Court similarly concludes that summary judgment is inappropriate on Plaintiffs' assault and battery claims.

### B. False Arrest and False Imprisonment

Plaintiffs also assert a cause of action for false arrest. The elements of a claim for false arrest are: (1) an arrest performed by the defendant, and (2) the unlawfulness of such arrest. *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (Minn. 1974). For the reasons discussed above with respect to Plaintiffs' federal claim for unlawful arrest, there are genuine issues of material fact that preclude summary judgment on this claim.

Finally, Plaintiffs assert a claim of false imprisonment. The common law regarding false imprisonment states that an individual may not, without legal justification, be confined against her or his will. *Gleason v. Metro. Council Transit Operations*, 563 N.W.2d 309, 319 (Minn. Ct. App. 1997) (citing *Kleidon v. Glascock*, 10 N.W.2d 394, 397 (1943) (false imprisonment is any imprisonment that is not legally justifiable)). Again, because there are factual issues with respect to the legality of Plaintiffs' seizure, fact issues remain with respect to Plaintiffs' claim for false imprisonment. Accordingly, summary judgment on the false imprisonment claim is denied.

### C. Respondeat Superior

Plaintiffs assert that the AHTF is liable on each of the state law tort claims because the claims occurred within the scope of the individual officers' employment. Under the doctrine of respondeat superior, an employer is vicariously liable for the torts of an employee committed within the course and scope of his or her employment. *Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999). Because the individual defendants are not entitled to official immunity and because there is sufficient record evidence that the alleged torts of the individual officers occurred within the course and scope of employment, the respondeat superior claim survives.

## CONCLUSION

Accordingly, based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1. Defendants' Motion for Summary Judgment (Doc. No. 28) is **GRANTED IN PART AND DENIED IN PART** as follows.

    a. Count Nine of Plaintiffs' Amended Complaint is **DISMISSED WITH PREJUDICE.**


Dated: October 23, 2009          s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge